IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KAREN ECHOLS, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-11-0882 |
| | § | |
| RYAN GARDINER, *et al.*, | § | |
| Defendants. | § | |

## <u>MEMORANDUM AND ORDER</u>

This civil rights case stems from an August 1, 2009, incident at the Woodland
Hills Apartment Complex in Kingwood, Texas, where Houston Police Department
(HPD) Officer Ryan Gardiner ("Gardiner") shot and killed John T. Barnes ("Barnes").
Plaintiffs in this case are Barnes' alleged common-law wife, Karen Echols ("Echols"),
who brings this case individually and as representative of Barnes' estate; Barnes'
father, John A. Barnes; and Barnes' ex-wife, April Phillips ("Phillips"), as next friend
of Barnes' children, CDB and JTB (collectively, "Plaintiffs"). Defendants are
Gardiner; the City of Houston ("City"); Hayden Properties, LLC ("Hayden"), JS
Property Management, Inc. ("JS"), and Woodland Hills Village Apartment Homes
("WH," and together with Hayden and JS, "Woodland Hills").

Before the Court are the following motions, all of which are ripe for
consideration: (a) Motion for Summary Judgment [Doc. # 83] filed by Woodland
Hills[1]; (b) Motion to Dismiss Karen Echols for Lack of Standing [Doc. # 84]

---

[1]     Plaintiffs filed a Response [Doc. # 119], to which Woodland Hills filed a Reply [Doc.
(continued...)

("Motion to Dismiss") filed by City and Gardiner (together, "City Defendants")[2]; (c) Motion for Summary Judgment [Docs. # 86 and # 87] filed by City Defendants[3]; (d) Motion to Bifurcate Trial [Doc. # 88] filed by City Defendants[4]; (e) Motion for Partial Summary Judgment on Ratification [Doc. # 89] ("Plaintiffs' Motion for Summary Judgment") filed by Plaintiffs[5]; and (f) Motion to Exclude Expert Witness and/or Testimony of Roger Clark [Doc. # 92] filed by Woodland Hills.[6]

Having reviewed the parties' briefs, the applicable legal authorities, and all matters of record, the Court **grants** Woodland Hills' Motion for Summary Judgment, **grants in part** and **denies in part** City Defendants' Motion to Summary Judgment, **denies** Plaintiffs' Motion for Summary Judgment, **denies** City Defendants' Motion to Dismiss, **denies as moot** City Defendants' Motion to Bifurcate Trial, and **denies as moot** Woodland Hills' Motion to Exclude Expert Witness Roger Clark. Accordingly, the claims against the City of Houston and against the Woodland Hills' entities are **dismissed with prejudice**. The claims against Gardiner will proceed.

---

[1]     (...continued)
    # 124] and Plaintiffs filed a Sur-reply [Doc. # 132].

[2]     Plaintiffs filed a Response [Doc. # 101], to which City Defendants filed a Reply [Doc. # 106].

[3]     Plaintiffs filed a Response [Docs. # 128 and # 129], to which City Defendants filed a Reply [Doc. # 133] and Plaintiffs filed a Sur-reply [Doc. # 134].

[4]     Plaintiffs filed a Response [Doc. # 99], to which City Defendants filed a Reply [Doc. # 102].

[5]     City Defendants filed a Response [Doc. # 103], to which Plaintiffs filed a Reply [Docs. # 109 and # 110].

[6]     Plaintiffs filed a Response [Doc. # 107], to which Woodland Hills filed a Reply [Doc. # 115] and Plaintiffs filed a Sur-reply [Doc. # 123].

## I.    BACKGROUND

Construing the record in the light most favorable to Plaintiffs, as the Court must on a motion for summary judgment, the evidence of record is as follows.

### A.    Incident at Woodland Hills Apartment Complex

On the night of August 1, 2009, John T. Barnes ("Barnes") and Plaintiff Echols began to argue in the apartment they occupied together at the Woodland Hills Apartment Complex in Kingwood, Texas.[7]   Their argument related to whether Echols' daughter could sleep in their bedroom.[8]   The argument inside the apartment ultimately turned physical.[9]   Eventually, Echols asked Barnes to leave the apartment and she put his belongings outside the apartment door.[10]   Barnes agreed to leave the apartment and went outside.[11]   Some time later, Echols heard a noise outside her apartment and went outside to "see what is was," out of concern that Barnes was damaging her car.[12]   Echols found Barnes outside, and they continued to argue there.[13]

---

[7]    Plaintiffs' Fourth Amended Original Complaint [Doc. # 40] ("Complaint"), ¶¶ 17, 20; Deposition of Karen Louise Echols [Exh. Q to Doc. # 86] ("Echols Dep."), at 15:20-16:11, 30:12-14.  Barnes had been drinking that day.  Echols Dep., at 31:11-12.

[8]    *Id.*, at 30:15-31:7.

[9]    *Id.*, at 35:22-36:15, 39:25-40:24.

[10]    *Id.*, at 41:4-14.

[11]    *Id.*, at 41:13-14.

[12]    *Id.*, at 42:5-9.

[13]    *Id.*, at 43:20-46:8.

Officer Gardiner was working that night as a courtesy officer at the Woodland Hills Apartment Complex.[14]  Gardiner was wearing his Houston Police Department ("HPD") uniform.[15]  Gardiner observed Barnes pounding on and kicking a car.[16]  Gardiner then saw Echols come out of an apartment and say to Barnes, "So you're going to beat up my car now?", after which Barnes ran up to Echols.[17]

After seeing Gardiner, Echols told Barnes to leave because the police had come.[18]  Gardiner approached Barnes and Echols and asked who lived in the apartment in the complex.[19]  Gardiner told Barnes to get away from Echols and to get on the ground.[20]  Barnes did not comply with the order.[21]  Barnes eventually left the porch and began to walk to his car.[22] As Barnes reached the place where Gardiner was standing, Gardiner grabbed Barnes, put his arm around Barnes' neck and shoulders and tried to throw him down; Barnes got away from Gardiner's grasp.[23] After they

---

[14]     Complaint, ¶ 18.  A courtesy officer is "[a] police officer who lives onsite to provide security."  Deposition of Ryan Gregory Gardiner [Exh. P to Doc. # 86] ("Gardiner Dep."), at 16:15-17.

[15]     Complaint, ¶ 18.

[16]     Gardiner Dep., at 185:20-23.

[17]     *Id.*, at 189:8-9.

[18]     Echols Dep., at 45:13-16; Gardiner Dep., at 191:24-25.

[19]     Echols Dep., at 46:20-23.

[20]     *Id.*, at 194:14-195:4; Echols Dep., at 47:7-9.

[21]     Gardiner Dep., at 195:2-4; Echols Dep., at 47:10-16.

[22]     Gardiner Dep., at 193:9-16.

[23]     Gardiner Dep., at 195:10-196:1; Echols Dep., 47:21-23, 56:11-16.

separated, Barnes continued to walk to his car and Gardiner walked to a different parking spot.[24]  Barnes reached his car and leaned against it.[25]  Gardiner then drew his gun and approached Barnes.[26]  Barnes said to Gardiner, "What are you going to do? Shoot me?"[27]  Gardiner then shot at Barnes.[28]

---

[24]   Gardiner Dep., at 196:7-10; Echols Dep., at 56:17-20.  According to Defendants, and contrary to Echols' testimony, *see* Echols Dep. at 59:4-13, while Barnes was on Echols' apartment porch, Gardiner drew his Conducted Energy Device ("CED") (*i.e.*, TASER) and "red dotted" Barnes.  Gardiner Dep., at 194:9-13.  "Red dotting" a suspect means to point a TASER's laser at a suspect in an attempt to make the suspect aware of the officer so that the suspect will follow the officer's orders.  *See* Affidavit of Ryan Gardiner [Exh. A to Doc. # 86] ("Gardiner Aff."), at 2.  Defendants also contend that at some point before the altercation, Gardiner holstered his TASER in anticipation of the physical altercation.  Gardiner Aff., at 3.

[25]   Echols Dep., at 57:6-58:5.

[26]   *Id.*, at 58:25-59:1; Complaint, ¶ 23.

[27]   Echols Dep., at 59:1-3; Complaint, ¶ 23.

[28]   Echols Dep., at 59:1-3; Complaint, ¶ 23.  Defendants proffer different evidence about what occurred.  According to Defendants, Gardiner tried to grab Barnes again to prevent him from driving under the influence of alcohol, and they struggled and wrestled for about 20 to 30 seconds.  Gardiner Aff., at 3; Gardiner Dep., at 196:11-197:7.  During this "second" encounter, Gardiner testified he felt Barnes reach towards Gardiner's waist area and pull out his TASER.  Gardiner Aff., at 3-4.  Gardiner testified that he broke free from Barnes' grip, drew his service gun, and ran back to create space between them.  *Id.*, at 4.  Gardiner stated Barnes was pointing the TASER at him.  *Id.*; Gardiner Dep., at 202:16-203:2.  Gardiner further claims that Barnes, while pointing the TASER at him, said, "You're a dead motherfucker now!" Gardiner Aff., at 4; Gardiner Dep., at 204:25-205:3.  In response, Gardiner shot Barnes.  Gardiner Aff., at 4.

Gardiner fired his weapon at Barnes nine times.[29]  According to the autopsy report, eight shots hit Barnes; five of those shots entered Barnes through his back.[30]

Echols has stated she did not see a TASER at all, either in Gardiner's hands prior to his encounter with Barnes or in Barnes' hands thereafter.[31]  Furthermore, four other witnesses to the incident (Justin Irby ("Irby"), Cory Gagnard ("Gagnard"), Sean Hicks ("Hicks"), and Joe Daniel Hull ("Hull")) stated that they did not see a TASER in Barnes' hands.[32]  DNA analysis was also performed on the TASER.  DNA swabs were taken from three areas of the TASER: the barrel (1A1); the trigger and safety region (1A2); and the grip (1A3).[33]  Barnes was excluded as a possible contributor of

---

[29]    Internal Affairs Division ("IAD") Investigative Report [Exh. F to Doc. # 86], at 31.

[30]    *See* Autopsy Report [Doc. # 129-3], at 3-7.

[31]    Echols Dep., at 59:4-13.  At some point after the incident, Echols stated to a reporter that Barnes had slapped a TASER from Gardiner's hands.  However, Echols' statement was based on what she later heard from others, and not from first hand knowledge.  *See id.*, at 63:3-20.

[32]    Deposition of Justin Irby [Exh. R to Doc. # 86] ("Irby Dep."), at 16:25-17:3; Deposition of Cory Gagnard [Exh. S to Doc. # 86] ("Gagnard Dep."), at 12:2-4; Deposition of Sean Hicks [Exh. T to Doc. # 86] ("Hicks Dep."), at 15:8-15; Investigation Summary [Doc. # 129-4], at 4 (statement of Joe Hull that "I could see both of his (Mr. Barnes) hand clearly  . . . he had nothing at all in them.").  City Defendants argue that these four witnesses "gave their statements after having seen news coverage of the incident, and had a number of inconsistencies in their statements." City Defendants' Motion for Summary Judgment [Doc. # 86], at 8-9.  However, City Defendants acknowledge that all four heard Barnes tell Gardiner to shoot him and that they did not see Barnes holding a TASER.  *Id.*, at 9.  Gardiner, on the other hand, stated that Barnes was holding and aiming the TASER at him prior to the shooting.  According to IAD's Investigation Summary, "Officer Gardiner's TASER was recovered from underneath the rear area of Mr. Barnes' vehicle." IAD Investigation Summary [Exh. E to Doc. # 86], at 4.

[33]    IAD Investigation Summary [Exh. E to Doc. # 86], at 4; IAD Investigative Report
(continued...)

DNA to the barrel and trigger and safety region.[34]  The sample taken from the grip contained a DNA profile "consistent with a mixture of two individuals," and an HPD criminalist determined that "John Barnes cannot be excluded as a possible contributor to this DNA mixture."[35]

After firing his gun, Gardiner checked Barnes to see if he registered a pulse.[36] After determining that Barnes did not have a pulse, Gardiner used his radio to call the police dispatcher for an ambulance.[37]

---

[33]  (...continued)
[Exh. F to Doc. # 86], at 31.

[34]  Crime Laboratory Supplement to HPD Offense Report [Exh. J to Doc. # 86], at 1; Expert Report of Roger Clark [Doc. # 128-20], at 17 (apparently relying on the Crime Lab report or other experts' conclusions); Deposition of Robin Guidry [Doc. # 128-8] ("Guidry Dep."), at 12:6-13:25.

[35]  Crime Laboratory Supplement to HPD Offense Report [Exh. J to Doc. # 86], at 2. The TASER swabs done at the HPD crime laboratory was the second time the TASER had been swabbed.  Deposition of Juli Rehfuss [Exh. V to Doc. # 86] ("Rehfuss Dep."), at 59:17-23.  Prior to being swabbed at the crime lab, the TASER was swabbed at the crime scene in a number of areas, including on the trigger.  Deposition of Ruth A. Nunez [Exh. U to Doc. # 86] ("Nunez Dep."), at 49:5-24.  The results from the initial swab (Item 2) indicated that "John Barnes cannot be excluded as the major contributor to this DNA mixture."  Crime Laboratory Supplement to HPD Offense Report [Exh. J to Doc. # 86], at 2. According to Defendants, DNA analysis from Item 2 indicates that "Barnes was the major contributor of DNA in the sample."  City Defendants' Motion for Summary Judgment [Doc. # 86], at 11.  Defendants also note that the second set of swabs may have contained less DNA overall because the first swab (taken at the crime scene) "would have taken most of the possible contact DNA off of the TASER."  Rehfuss Dep., at 59:16-22; City Defendants' Motion for Summary Judgment [Doc. # 86], at 11.

[36]  Gardiner Dep., at 206:3-6; Echols Dep., at 78:1-4.

[37]  Gardiner Dep., at 207:3-7; Echols Dep., at 79:8-15.

### B.   Investigation of the Incident

Two divisions in HPD conducted investigations into the incident: the Homicide Division performed a criminal investigation and the Internal Affairs Division ("IAD") evaluated whether the shooting was within HPD policy.[38]

HPD Homicide Division gathered evidence and provided its findings to the Harris County District Attorney's Office.[39]  In cases of officer-involved shootings, the District Attorney's Office conducts its own investigation after receiving the findings of HPD Homicide Division.[40]   Here, after investigating the matter, the District Attorney presented the evidence to a grand jury, which "no-billed" Gardiner.[41]

IAD also gathered evidence, interviewed witnesses, and received the evidence gathered by HPD's Homicide Division.[42]  HPD contends that its IAD investigation adhered to standard protocol.[43]  Under that protocol, officers interviewed by IAD are entitled to receive "a copy of all statements, all evidence, [and] all witness statements prior to the interrogation."[44]  After the investigation is complete, the lieutenant in charge of the investigation makes recommendations on the findings and outcome, and

---

[38]     Deposition of Michael A. Dirden [Exh. Y to Doc. # 86] ("Dirden Dep."), at 212:7-17.

[39]     Deposition of John R. Johnston [Exh. W to Doc. # 86] ("Johnston Dep."), at 21:13-19.

[40]     *Id.*, at 22:1-5.

[41]     Case Disposition [Exh. H to Doc. # 86].

[42]     Dirden Dep., at 212:12-17.

[43]     *See* City Defendants' Motion for Summary Judgment [Doc. # 86], at 11-12.

[44]     Dirden Dep., at 211:10-15; *see also* Corrective Action Manual [Doc. # 129-9], at 12.

passes the recommendations through the chain of command within HPD.[45]  The chief of police makes the ultimate decision about whether the shooting was justified.[46]  IAD, in accordance with this protocol, supplied Gardiner with witness statements and other documents previously gathered.[47]  Gardiner prepared a written statement in response.[48]  Based on the information presented, IAD ultimately determined that the shooting was justified.[49]  Based on that investigation, Chief of Police Charles A. McClelland Jr. ("McClelland") adopted the investigator's recommendation and concluded that the shooting was justified.[50]

### C.    Gardiner's HPD History

Gardiner joined HPD in December 2001 and became a commissioned police officer in December 2002.[51]  Prior to the incident on August 1, 2009, twenty-three complaints had been lodged against Gardiner.[52]  Of these complaints, two were "sustained"; each of these involved an "at-fault" car accident.[53]  Three of the

---

[45]     Dirden Dep., at 215:24-216:8.

[46]     *Id.*, at 216:8-12.

[47]     IAD Investigative Report [Exh. F to Doc. # 86], at 20.

[48]     *Id.*, at 20-26.

[49]     IAD Investigation Summary [Doc. # 129-4], at 6-8.

[50]     Objections and Answers of Charles A. McClelland Jr. to Plaintiffs' Interrogatories [Doc. # 129-7], at 15-16.

[51]     Employee Resume [Exh. C to Doc. # 86], at 2.

[52]     Employee Complaint History [Exh. B to Doc. # 86], at 1.

[53]     *Id.*

complaints involved the discharge of firearms, each of which was deemed "justified" by IAD.[54]  Six of the complaints related to the "use of force."[55]

In addition to these complaints, Gardiner had twelve CED (TASER) deployments prior to the Barnes incident.[56]  All of these deployments occurred in the nineteen months between February 8, 2005, and September 7, 2006.[57]  Gardiner had no CED deployments in the nearly three years from September 8, 2006, and the Barnes incident on August 1, 2009.[58]

### D.   HPD Policies

Among numerous topics, HPD trains prospective officers (cadets) "in [the] laws of arrest, search and seizure, the Texas Code of Criminal Procedure, the Texas Penal Code, and the U.S. Constitution."[59]  Cadets also receive training in the use of force, and are provided guidance about when the use of deadly force is permitted.[60]  Once cadets become commissioned police officers, they periodically are provided

---

[54]     *Id.*; Rule 26(a)(2) Expert Report of Mark Farrell [Exh. O to Doc. # 86] ("Farrell Report"), at 14.

[55]     Employee Complaint History [Exh. B to Doc. # 86], at 1.

[56]     Gardiner's CED Deployments [Doc. # 129-6].

[57]     Farrell Report, at 13.  During a period from approximately 2005 to 2007, half of the HPD officers employed at that time deployed their TASERs only one or two times. Deposition of Charles Aaron McClelland, Jr. [Doc. # 128-13] ("McClelland Dep."), at 181:2-184:6.

[58]     Farrell Report, at 13.

[59]     Expert Report of Michael Dirden [Exh. M to Doc. # 86] ("Dirden Report")*,* at 4.

[60]     *Id.*, at 4-6.  HPD General Order 600-17 directs officers that the use of deadly force should be limited to "those circumstances in which officers reasonably believe it is necessary to protect themselves or others from serious bodily injury or death."  *Id.*, at 5-6.

with updated rules and orders, are evaluated for their performance twice a year, and complete in-service training.[61]

HPD policies regarding officer training "meet or exceed" the requirements established by the Texas Commission on Law Enforcement Officer Standards and Education ("TCLEOSE").[62]  Gardiner completed all standard training prior to being commissioned in December 2002 and completed additional training after that.[63]

HPD employs an "early warning system" known as the Personnel Concerns Program ("PCP") to identify officers with "persistent negative behavior."[64]   An officer can be referred to the PCP by various sources, including the Chief of Police, the officer's supervisor, or a monthly data scan.[65]  The monthly data scan involves "a computerized scan of IAD records to identify officers who were the target of four or more sustained or non-sustained IAD complaints within a 12-month period."[66]  Upon referral by one of these sources, the Personnel Concerns Unit ("PCU") reviews the identified officer's complaint history.  The PCU prepares a report for the Personnel Concerns Committee ("PCC"), which makes a recommendation to the Chief of Police for an officer's placement or non-placement into the PCP.[67]   The Chief of Police

---

[61]     *Id.*, at 5.

[62]     *Id.*, at 4.

[63]     Expert Report of Terry Bratton [Exh. N to Doc. # 86] ("Bratton Report"), at 3.

[64]     General Order 300-24 [Exh. L to Doc. # 86], at 1.

[65]     *Id.*, at 3.

[66]     *Id.*

[67]     *Id.*, at 3-4.

approves all recommendations.[68]  Not all officers who are identified for placement in the PCP and reviewed by the PCU are placed into the PCP program.[69]

CED (TASER) deployments are reviewed under a separate system, whereby an incident report is generated for each deployment and reviewed by the officer's supervisor to see whether the CED deployment conformed with HPD policy.[70]  HPD keeps track on a spreadsheet of all CED deployment reports.[71]  HPD's PCP computerized monthly data scan does not include CED deployment incidents.  At an October, 2005, conference organized by the Police Executive Research Forum ("PERF")[72] and held in Houston, Texas, PERF recommended that CED deployments be included in law enforcement agencies' early warning systems.[73]  That conference was attended by, among others, Chief of Police McClelland and his predecessor,

---

[68]     *Id.*, at 4.

[69]     Dirden Report, at 7.  A review of Gardiner's complaint history and other evidence indicates that Gardiner should have, but was not, identified for PCP review at an earlier point. *Id.*  Executive Assistant Chief Michael Dirden, Chairperson of the PCC, stated that Gardiner would not have been placed in the PCP.  *Id.*

[70]     General Order 400-26 [Doc. # 128-17], at 3.

[71]     Deposition of Reid Cashdollar [Exh. DD to Doc. # 86] ("Cashdollar Dep."), at 97:4-16; Summary of Significant Event Report Involving CEDs [Exh. # 129-11].

[72]     PERF is "a professional organization of progressive chief executives of city, county, and state law enforcement agencies" which "is unique in its commitment to the application of research in policing" and which "conduct[s] some of the most innovative police and criminal justice research and provides a wide variety of management and technical assistance programs to police agencies throughout the world."  James M. Cronin & Joshua A. Ederheimer, Conducted Energy Devices: Development of Standards for Consistency and Guidance ("PERF Recommendation") [Doc. # 128-14], at 39.

[73]     *Id.,* at 27; McClelland Dep., at 121:9-20, 140:8-18; Dirden Report, at 8.

Chief of Police Harold Hurtt.[74]  HPD did not adopt that recommendation.[75]  Had CED deployments been tracked in the HPD's PCP system, Gardiner would have had four incidents within a twelve month span, which Plaintiffs' contend would have triggered PCP review, on seventeen occasions.[76]

### E.    Woodland Hills' Hiring of Gardiner

Gardiner was hired as a courtesy officer for Woodland Hills in April 2009.[77] In exchange for his service as a courtesy officer at the apartment complex, Gardiner received a monthly $800 per month rent concession.[78]  Gardiner signed a "courtesy officer agreement" when he began working at Woodland Hills.[79]

At all times relevant to this lawsuit, prior to hiring a courtesy officer, Woodland Hills verified an applicant's criminal history, credit, and employment history and current employment.[80]  Woodland Hills did not investigate prior complaints against police officers that were not disclosed in an applicant's

---

[74]    McClelland Dep., at 122:7-12.

[75]    *See* Dirden Report, at 8.

[76]    Plaintiff's Response [Doc. # 128], at 28-30.  Plaintiffs derived this number from information culled from Gardiner's IAD Complaint History and Gardiner's CED Deployments.  *See* Gardiner's IAD Complaint History [Exh. B to Doc. # 86]; Gardiner's CED Deployments [Exh. G to Doc. # 86].

[77]    Courtesy Officer Agreement [Exh. B to Doc. # 83].

[78]    *Id.*

[79]    *Id.*

[80]    Deposition of Amanda Krause [Exh. 2 to Doc. # 119] ("Krause Dep."), at 36:13-20, 63:22-64:21, 66:21.

employment history.[81]   Woodland Hills hired Gardiner on the recommendation of another HPD officer, and because Gardiner he was an active-duty HPD officer.[82]

Under the courtesy officer agreement, Gardiner's responsibilities included: opening and closing pools; walking the property nightly; responding to noise complaints; contacting police when necessary to respond to situations; and providing a weekly report to the property manager regarding his nightly walks and the property's outdoor lighting needs.[83]   Gardiner was told that he should wear his HPD uniform when patrolling the apartment complex at night.[84]   Woodland Hills did not set hours for courtesy officers.[85]   There were several courtesy officers employed at Woodland Hills, and the officers decided their work shifts among themselves.[86] Furthermore, Woodland Hills did not supervise courtesy officers outside of ensuring they turned in the required reports, and did not conduct regular performance reviews of the officers.[87]   Gardiner was never given any instruction by Woodland Hills managers as to how to perform his duties.[88]

---

[81]     *Id.*, at 66:17-67:9.

[82]     Woodland Hills Objections and Answer to Plaintiffs' Interrogatories [Exh. 4 to Doc. 119], at 6.

[83]     Courtesy Officer Agreement [Exh. B to Doc. # 83].

[84]     Gardiner Dep., at 24:3-13.

[85]     Krause Dep., at 31:21-25.

[86]     *Id.*, at 94:13-19.

[87]     *Id.*, at 92:1-20, 96:10-17.

[88]     *Id.*, at 29:20-23.

Woodland Hills' agreement with its courtesy officers cautions that "[t]he well-being and safety of the Courtesy Officer, resident, on-site personnel, visitors, or guests are not to be endangered."[89]   In the approximately four months Gardiner worked at Woodland Hills prior to the incident on August 1, 2009, Gardiner never detained anyone at the apartment complex and never called HPD about an incident.[90]

### F.   **Plaintiffs' Claims**

Plaintiffs filed this case on March 9, 2011.[91]   Plaintiffs bring two claims against Gardiner under 42 U.S.C. § 1983: (1) the "unreasonable, unjustified, and excessive use of deadly force"; and (2) "failing to provide medical attention."[92]   Plaintiffs also bring claims against the City of Houston under § 1983 for: (1) a pattern and practice of allowing excessive force; (2) failing to train and supervise officers with regards to the use of force; (3) failing to train and supervise Gardiner; and (4) "affirming, ratifying, and adopting the unlawful conduct of Officer Gardiner."[93]   Finally, Plaintiffs bring claims against Woodland Hills for: (1) negligently hiring, training,

---

[89]   Courtesy Officer Agreement [Exh. B to Doc. # 83].

[90]   Gardiner Dep., at 27:25-28:15.

[91]   The original complaint was filed by Echols against Gardiner solely in his official capacity.  *See* Plaintiff's Original Complaint [Doc. # 1].  The complaint later was amended to add John A. Barnes and Phillips as Plaintiffs and to add claims against HPD and Woodland Hills and claims against Gardiner in his individual capacity.  *See* Plaintiffs' First Amended Original Complaint [Doc. # 7].

[92]   Complaint, ¶¶ 54-62.

[93]   *Id.*, ¶¶ 63-73.

and supervising Gardiner; and (2) *respondeat superior*.[94]   Plaintiffs seek damages from Defendants based on these allegations.[95]

## II.   KAREN ECHOLS' STANDING

City Defendants assert that Echols lack standing to bring this case and have moved to dismiss her as a party plaintiff under Rule 12(b)(1) of the Federal Rules of Civil Procedure.   Specifically, City Defendants argue that Echols can only bring claims under 42 U.S.C. § 1983 if she was Barnes' legally-recognized spouse, and that the evidence shows that Echols was not Barnes' wife  by ceremony or under common law.[96]   The Court **denies** City Defendants' Motion to Dismiss.

### A.   Legal Standard

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."   *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005) (citations omitted).   In considering a challenge to subject matter jurisdiction, the district court is "free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case."   *Id.*   When the court's subject matter jurisdiction is challenged, the party asserting jurisdiction bears the burden of establishing it.   *See Davis v. United States*, 597 F.3d 646, 649 (5th Cir. 2009).   A motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject matter jurisdiction. *Id.*   The Court must "take the well-pled factual allegations of the complaint as true

---

[94]      *Id.*, ¶¶ 74-79.

[95]      *Id.*, ¶¶ 80-85.

[96]      *See* City Defendants' Motion to Dismiss [Doc. # 84], at 5-9.

and view them in the light most favorable to the plaintiff." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2007).

**B.   Analysis**

To bring a wrongful death claim under 42 U.S.C. § 1983, a party must have standing under the wrongful death statute of the state in which the case is brought. *See* 42 U.S.C. § 1988(a) (noting that state common law fills in gaps in civil rights cases); *Pluet v. Frasier*, 355 F.3d 381, 383 (5th Cir. 2004). The Texas Wrongful Death Act ("TWDA") provides that an action can be brought by "the surviving spouse, children, and parents of the deceased." TEX. CIV. PROC. & REM. CODE § 71.004(a). The right to bring an action as a "spouse" extends to spouses by common law marriage. *Galveston, H. & S. A. Ry Co. v. Cody*, 50 S.W. 135, 137 (Tex. Civ. App. 1899) ("A woman who becomes a wife by a common-law marriage and the issue of such marriage are as much entitled to recover damages for the death of the husband and father as though the marriage had been by license duly issued.").

Common law marriage in Texas occurs when the parties to the marriage "(1) agreed to be married, (2) lived together in Texas as husband and wife after the agreement, and (3) there presented [to] others that they were married." *Small v. McMaster*, 352 S.W.3d 280, 282 (Tex. App.–Houston [14th Dist.] 2011, pet. denied) (citing Tex. Fam. Code § 2.401(a)(2)).[97] The parties to this case disagree as to whether Echols and Barnes were common law husband and wife. City Defendants argue that Echols cannot establish by a preponderance of the evidence that she was Barnes' common law wife because, among other reasons, Echols and Barnes did not

---

[97]     Some courts refer to the second prong of this test as "cohabitation." *See, e.g.*, *Shelton v. Belknap*, 282 S.W.2d 682, 683-84 (Tex. 1955).

sufficiently hold themselves out to others as married.[98]  City Defendants also stress that Echols and Barnes never met the elements of a common law marriage simultaneously.[99]    *See, e.g.*, *Wilfred v. Renfro*, 821 S.W.2d 640, 645 (Tex. App.–Houston [1 Dist.] 1991, writ denied) ("A common law marriage does not exist until the concurrence of all three elements.").  Plaintiffs disagree and rely on various pieces of evidence to support their claim.

As noted above, the motion to dismiss for want of subject matter jurisdiction can only be granted "if it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject matter jurisdiction." *Davis*, 597 F.3d at 649.  Plaintiffs have presented ample evidence indicating that they can plausibly prove that Echols was Barnes' common law wife, and thus that she has standing in her individual capacity.  City Defendants do not appear to dispute that Echols and Barnes agreed to be married and that they cohabited.  The parties' dispute on standing focuses on the third prong of the test.  Plaintiffs cite numerous statements from Echols herself indicating that she and Barnes conducted themselves as husband and wife.[100]  Moreover, Plaintiffs cite, among other things, evidence that Echols and Barnes maintained a joint bank account and that multiple friends testified that Echols and Barnes held themselves out as married.[101]  Plaintiffs also note that the Harris County

---

[98]    City Defendants' Motion to Dismiss [Doc. # 84], at 5-9; Reply of City Defendants [Doc. # 106], at 6-9.

[99]    *See* City Defendants' Reply [Doc. # 106], at 8-9.

[100]    *See, e.g.*, Affidavit of Karen Echols [Exh. 4 to Doc. # 101], ¶¶ 6-7; Echols Dep., at 12:2-13:1.

[101]    *See, e.g.*, Echols Dep., at 18:5-11, 18:24-19:6; Affidavit of Jeanette Echols [Exh. 5 to Doc. # 101], ¶¶ 6-7; Affidavit of Linnie Nichols [Exh. 6 to Doc. # 101], ¶¶ 6-7; (continued...)

Probate Court, in appointing Echols the administrator of Barnes' estate and declaring heirship to that estate, determined that Echols was Barnes' common law wife.[102]  City Defendants attempt to discredit this evidence with inconsistent statements by Echols indicating that she and Barnes were not married and by offering differing interpretations of Plaintiffs' evidence.[103]   Viewing the facts "in the light most favorable to Plaintiffs," *Lane*, 529 F.3d at 557, the Court concludes that Plaintiffs have adduced facts sufficient to establish that Echols has standing to assert her individual claims.  She has presented meaningful evidence that she and Barnes were common law husband and wife.  The Court is unpersuaded that there is no plausible set of facts establishing the Court's jurisdiction.  The Court therefore denies City Defendants' Motion to Dismiss.

Moreover, to the extent that City Defendants seek dismissal for lack of standing of Echols as the representative of Barnes' estate,[104] the Court denies this request.  The Harris County Probate Court has appointed Echols representative of the estate.[105]   Federal courts have "no jurisdiction to probate a will or administer an estate." *Breaux v. Dilsaver*, 254 F.3d 533, 536 (5th Cir. 2001) (quoting *Markham v.*

---

[101]    (...continued)
Affidavit of Linnie Nichols [Exh. 2 to Doc. # 101], ¶¶ 7-9.

[102]    *See* Judgment Declaring Heirship [Exh. 9 to Doc. # 101].

[103]    *See, e.g.*, Witness Statement of Karen Echols [Exh. A to Doc. # 84], at 2; Echols Dep., at 14:8-17:9; City Defendants' Reply [Doc. # 106], at 4-5.

[104]    *See* City Defendants Motion to Dismiss [Doc. # 84], at 4 n.1.  City Defendants raise this issue in a footnote, but do not explicitly request this relief.  Moreover, City Defendants fail to address this issue again in their Reply.

[105]    Order Granting Letters of Administration [Exh. 7 to Doc. # 101].

*Allen*, 326 U.S. 490, 494 (1946)).[106]   Because the representative of an estate has standing to bring a claim under the Texas Survival State, TEX. CIV. PRAC. & REM. CODE § 71.021(b), City Defendants, in effect, request that the Court overturn the appointment decision of the probate court that Echols serve as the administrator of the Barnes estate.   The Court cannot do so, and accordingly denies the request to dismiss Echols in her capacity as representative of the Barnes estate.[107]

## III.   **MOTIONS FOR SUMMARY JUDGMENT**

### A.   **Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).   Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

---

[106]   The "probate exception" to federal jurisdiction provides that "federal courts of equity have jurisdiction to entertain suits in favor of creditors, legatee[s], and heirs and other claimants against a decedent's estate to establish their claims so long as the federal court does not interfere with the probate proceedings or assume general jurisdiction of the probate or control of the property in custody of the state court."   *Breaux*, 254 F.3d at 536 (quoting *Markham*, 326 U.S. at 494).   That exception is not implicated here since this is not a suit *against* "a decedent's estate."

[107]   The Court also notes that Echols' standing to sue Woodland Hills is unaffected by the standing analysis for § 1983 claims.   Woodland Hills has not moved to dismiss Echols for lack of standing.

movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex*, 477 U.S. at 322-23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The moving party, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'" *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the court reviews the facts and inferences to be drawn from them in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (holding that unverified pleadings

do not "constitute competent summary judgment evidence").  Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).  Instead, the nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case." *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted).  In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

The Court may make no credibility determinations or weigh any evidence, and must disregard all evidence favorable to the moving party that the jury is not required to believe.  *See Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co.*, 336 F.3d at 412-413).  The Court is not required to accept the nonmovant's conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence. *Id.* (citing *Reaves Brokerage*, 336 F.3d at 413).  Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence. *See* FED. R. CIV. P. 56(c)(4); *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733, 745 (S.D. Tex. 2003). A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary.  *See In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000) ("A party's self-serving and unsupported claim that she lacked the requisite intent is not sufficient to defeat summary judgment where the evidence otherwise supports a finding of fraud."  (citation omitted)).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *See id.* (internal citations and quotations omitted).[108]

## B.     Liability of the City of Houston

Municipalities are deemed to be "persons" susceptible to suit under § 1983. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). Municipal liability, however, cannot be sustained under a theory of *respondeat superior* or vicarious liability. *Id.* at 691; *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997). A municipality is only liable under § 1983 for acts that are "directly attributable to it 'through some official action or imprimatur.'" *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). For liability to attach, "the municipality must cause the constitutional tort, which occurs 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008) (quoting *Monell*, 436 U.S. at 694).

To hold a municipality liable under this standard, "a plaintiff must show, in addition to a constitutional violation, that an official policy promulgated by the

---

[108]    Plaintiffs appear to request that this Court strike City Defendants' Motion for Summary Judgment [Doc. # 86] on the grounds that City Defendants have failed to establish genuine issues of material fact that are not in dispute. *See* Plaintiffs' Response [Doc. # 128], at 10-12. Plaintiffs have not made a formal motion to strike City Defendants' motion. For the reasons set out below, Plaintiffs' request is denied.

municipality's policymaker was the moving force behind, or actual cause of, the constitutional injury." *James*, 577 F.3d at 617.  The plaintiff must establish a "direct causal link" between the municipal policy and the constitutional deprivation.  *Id.* (citations and quotations omitted).  This requires "direct causation," meaning a "direct causal link," between the policy and the alleged violation, *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 848 (5th Cir. 2009) (internal quotations omitted).  This causal connection "must be more than a mere 'but for' coupling between cause and effect." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 310 (5th Cir. 2004) (quoting *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992)).  Rather, "a municipal policy must be affirmatively linked to the constitutional violation and be the moving force behind it." *Id.* (quoting *Fraire*, 957 F.2d at 1281).

Official policy, which establishes municipal culpability, "can arise in various forms." *Peterson*, 588 F.3d at 847.  Official policy usually exists in the form of "written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James*, 577 F.3d at 617 (citations and quotations omitted)).  "A policy is official only 'when it results from the decision or acquiescence of the municipal officer or body with 'final policymaking authority' over the subject matter of the offending policy.'" *Id*. (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)); *see also Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) ("Knowledge on the part of a policymaker that a constitutional violation will most likely result from a given official custom or policy is a *sine qua non* of municipal liability under section 1983.").

In addition, if the policy at issue is not facially unconstitutional, a plaintiff must also show that it was adopted with deliberate indifference as to its known or obvious consequences. *James*, 577 F.3d at 617 (internal quotations and citations omitted). Deliberate indifference, in this context, "is a degree of culpability beyond mere negligence or even gross negligence; it 'must amount to an intentional choice, not merely an unintentionally negligent oversight.'" *Id.* at 617-18 (quoting *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992); *Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000)). The Fifth Circuit has emphasized that the moving-force and deliberate-indifference elements of municipal liability "must not be diluted, for '[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.'" *James*, 577 F.3d at 618; *see also Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998) (quoting *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397 (1997)).

In this case, Plaintiffs allege the following bases for municipal liability: (1) a custom and practice of allowing HPD officers to use excessive force and failing to properly investigate complaints alleging excessive force; (2) failure to train and supervise HPD officers; (3) "single-incident liability" (that is, failure to appropriately train and supervise Gardiner); and (4) ratification of Gardiner's conduct. For the reasons detailed below, the Court grants the City's Motion for Summary Judgment as to each of these claims and denies Plaintiffs' Motion for Partial Summary Judgment as to the issue of ratification.

### 1.    Custom and Practice of Allowing Excessive Force

Plaintiffs allege that the City "had a general policy, pattern and/or practice of not disciplining police officers for their conduct, thereby sanctioning the police officers' actions, which amounted to a departmental policy of overlooking

constitutional violations."[109]   More particularly, Plaintiffs contend that the City
(through HPD) does not adequately investigate officer-involved shootings, and that
HPD officers were aware of this practice.[110]   Plaintiffs cite generally to a report of
their expert, Roger Clark, for the proposition that HPD has systematically ignored
incriminating evidence that would hold officers accountable in these shootings.[111]
Moreover, Plaintiffs complain that IAD investigations into officer-involved shootings
are procedurally deficient because officers are provided with all of the evidence and
questions that form the basis of an interrogation before the officer's own
interrogation, and that the investigations thus "are designed to avoid detecting
misconduct."[112]

Assuming solely for the purposes of the pending motions that HPD's IAD
investigatory techniques are constitutionally deficient, Plaintiffs have failed to show
how this policy caused (*i.e.*, was the "moving force" behind) Gardiner's actions.  To
prove causation, Plaintiffs must submit evidence that Gardiner had actual knowledge

---

[109]    Complaint, ¶ 64.

[110]    Plaintiffs' Response [Doc. # 128], at 42-43.

[111]    Expert Report of Roger Clark [Doc. # 128-20], at 5, 17-23.  Plaintiffs do not specify
the specific opinions by Clark on which they rely here.  Therefore, the Court does not
reach the issue of admissibility.  In any event, Clark's opinions do not—and
cannot—reliably address the dispositive issue, Gardiner's perceptions, as explained
hereafter in this section of the Memorandum.  It is further noted that many of Clark's
opinions are not admissible in evidence because they are merely the *ipse dixit* of the
expert, lacking in reasoning or connection to recognized authorities.  *See Kumho Tire
Co. v. Carmichael*, 526 U.S. 137, 157 (1999); *Gen. Elec. Co. v. Joiner*, 422 U.S. 136,
146 (1997); *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009) (citing *Daubert v.
Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596-597 (1993)); *Moore v. Ashland Chem.
Co.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc)).

[112]    Plaintiffs' Response [Doc. # 128], at 42-46.

of the City's (alleged) policy to under-investigate officer-involved shootings and not properly discipline for them. *See James*, 577 F.3d at 618 ("To show that the alleged policy was the moving force behind Wilkinson's use of excessive force, the family was required, at a minimum, to adduce evidence that Wilkinson understood that it was the Sheriff's official policy only to cursorily investigate officer-involved shootings and consequently not to discipline for the conduct . . . . Thus, nothing in Wilkinson's own testimony suggested his actual personal knowledge of the Sheriff's policy."). Plaintiffs have proffered no evidence regarding how alleged inadequacies of IAD's previous investigations of HPD officers or of Gardiner in particular affected Gardiner's perception of those practices. Instead, Plaintiffs conclusorily state that, because IAD earlier investigated complaints about Gardiner, including complaints of his several shootings, "it would be farcical to suggest that Defendant Gardiner did not know about this policy . . . . Defendant Gardiner knew exactly how the system worked and he knew it would clear him for killing Mr. Barnes."[113] Plaintiffs' bald assumption is not sufficient to create a genuine issue of material fact with regard to whether the City's IAD procedures "caused" the shooting of Barnes.[114]

Plaintiffs proffer a corollary to their first argument. In essence, Plaintiffs deduce that because the City provided Gardiner with these materials, Gardiner was able to concoct a story to fit the evidence; because Gardiner was able to concoct a story, Gardiner knew (before the incident) that he could violate city policy without concern for discipline; because Gardiner knew that he would not be reprimanded, Gardiner used excessive force to shoot and kill Barnes; and, therefore, the City is liable for Gardiner's shooting. This theory fails for the same reason as the above

---

[113] *Id.*, at 46.

[114] Plaintiffs' expert's opinions do not, and cannot, address this issue.

argument.  Even if state law does not require the City's IAD procedure of showing the accused officer all other witnesses' statements,[115] and even if the City's policy is constitutionally infirm, Plaintiffs have not shown that the policy "directly caused" the shooting.  Plaintiffs' argument here is built on a series of inferences for which they offer no proof.  Plaintiffs cite no evidence to show that Gardiner in fact knew of IAD's policy prior to the incident itself.  Accordingly, Plaintiffs have not established potential City liability on this basis.

### 2.      Failure to Train or Supervise

Plaintiffs also assert that the City is liable under § 1983 for failure to properly train and supervise its police officers.[116]  Plaintiffs' Complaint focuses only on the general concept of the "use of force or deadly force."[117]  In their response to City Defendants' Motion for Summary Judgment, however, Plaintiffs focus their claim on

---

[115]     The parties disagree whether state law requires the City to provide investigated officers with "any statements or affidavits from witnesses, officers, or supervisors of which the interrogation is based in whole or in part."  Corrective Action Manual [Doc. # 129-9], at 12.  Chapter 143 of the Texas Local Government Code mandates that "not later than the 48th hour before the hour on which an investigator begins to interrogate a fire fighter or police officer regarding an allegation based on a complaint, affidavit, or statement, the investigator shall give the fire fighter or police officer a copy of the affidavit, complaint, or statement."  TEX. LOC. GOV'T CODE § 143.123(f).  City Defendants contend that this law requires HPD to provide *all* evidence (*e.g.*, statements of complainants and of other witnesses) to an interrogated officer at least 48 hours before the interrogation.  City Defendants' Reply [Doc. # 133], at 19-20. Plaintiffs, in contrast, argue that the law only requires that the "officer be furnished with the complaint, affidavit, or statement that *initiates* the misconduct investigation."  Plaintiffs' Sur-reply [Doc. # 134], at 9.  The Court does not decide whether § 143.123(f) actually mandates this policy.

[116]     Complaint, ¶ 67.

[117]     *Id.*

the City's failure to include CED deployments in the HPD's PCP early warning system.[118]  The Court addresses only Plaintiffs' more specific arguments.

Municipal liability extends to failure to train or supervise claims under "limited circumstances."  *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989). Failure to properly train police officers can "serve as a basis for § 1983 claims only where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact."  *Id.* at 388 (emphasis added).  The Fifth Circuit has explained that to succeed on a failure to train claim a plaintiff must show that: "(1) [the municipality's] training policy procedures were inadequate, (2) [the municipality] was deliberately indifferent in adopting its training policy, and (3) the inadequate training policy directly caused [the plaintiff's injury]."  *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010).  The standard for failure to supervise claims is the same as for failure to train claims.  *See Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009).  The Court concludes that Defendants have met their summary judgment burden on these claims.

In *Board of County Commissioners of Bryan County, OK v. Brown*, the Supreme Court adopted a strict interpretation of "deliberate indifference."  *See Bd. of County Comm'rs of Bryan County, OK v. Brown*, 520 U.S. 397 (1997).  The plaintiff in *Bryan County* brought claims against the county for failing to hire and train an officer who had used excessive force in arresting her.  *Id.* at 399-400.  In vacating the lower courts' imposition of liability on the county, the Supreme Court warned that "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held

---

[118]     Plaintiffs' Response [Doc. # 128], 22-37.

liable solely for the actions of its employees." *Id.* at 405.  The Court noted that *City of Canton* had focused on a "deficient training program, necessarily intended to apply over time to multiple employees."[119]  *Id.* at 407.  Moreover, the Court strengthened the causation requirement in a "deliberate indifference" analysis, stating that "[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk *that a violation of a particular constitutional or statutory right* will follow the decision."  *Id.* at 411 (emphasis added).[120]

Similarly, the Fifth Circuit has stated that "[t]o establish deliberate indifference, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation."  *Goodman*, 571 F.3d at 395 (quoting *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003)).  "Moreover, for liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective."  *Id.* (quoting *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005)).

---

[119]     The Court in *Canton* focused on a "program" because:

> Existence of a "program" makes proof of fault and causation at least possible in an inadequate training case.  If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. . . . In addition, the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the "moving force" behind the plaintiff's injury.

*Id.* at 407-08.

[120]     The Court stated this standard with regard to the plaintiff's inadequate hiring claim. It did not, however, limit its stricter standard to those claims alone.

### a.   Failure to Train

The City asserts that it is entitled to summary judgment on Plaintiffs' "failure to train" claims.  The City presents undisputed evidence that HPD cadets are provided with extensive training prior to being commissioned as police officers.  In particular, cadets are trained in the use of force and are taught HPD policies regarding the use of force and use of deadly force.   Indeed, HPD's training "meets or exceeds" TCLEOSE standards for training.   Furthermore, HPD also provides in-service training periodically, including training on the use of weapons and the use of force.[121] Plaintiffs have not responded to these contentions in their briefing, and have submitted no evidence of the City's deliberate indifference to the risk of a violation of a particular constitutional or statutory right.  Plaintiffs thus have not created a genuine issue of material fact on their "failure to train" claims.[122]   Accordingly, the City is entitled to summary judgment on Plaintiffs' failure to train claim.

### b.   Failure to Supervise

Plaintiffs assert that the City failed to properly supervise HPD officers through

---

[121]     *See* Bratton Rep., at 3.

[122]     Plaintiffs' expert, Roger Clark, originally opined that Gardiner individually lacked proper training, and referred anecdotally to instances he contends show the absence of retraining of other HPD officers involved in excessive force claims.  *See generally* Expert Report of Roger Clark [Doc. # 128-20], at 4, 18-23. Clark conceded, however, in his deposition that HPD police training exceeded TCLEOSE standards, which the parties appear to agree are nationally recognized as sufficient.  He takes no issue with HPD's general training program as written.  *See* Plaintiffs' Sur-Reply to City Defendants' Motion to Exclude Clark [Doc. # 125], at 9.  The evidence presented does not create a genuine issue of material fact on Plaintiffs' failure to train claim against the City, as the evidence presented cannot show that the City's training was "inadequate" or that the City was "deliberately indifferent in adopting its training policy."

a faulty "early warning system."[123]  In particular, Plaintiffs argue that HPD
have included CED (TASER) deployments in its PCP review program.  Had HPD
done so, Plaintiffs contend, Gardiner would have been picked up by the PCP monthly
reviews seventeen times prior to the night of the incident, thereby alerting HPD
officials to the need to evaluate Gardiner's conduct more closely and to retrain
Gardiner.[124]   Plaintiffs also point to a law enforcement officers organization's
(PERF's) recommendation in October 2005 that police departments include CED
deployments in such performance reviews and HPD's failure to follow the
recommendation.[125]

Whether or not the City should have included CED deployments in its PCP
system, Plaintiffs have not demonstrated a genuine issue of material fact that the City
was "deliberately indifferent" in establishing its review system.  It is not legally
sufficient, as Plaintiffs assert, that the City "deliberately chose not to follow" the
PERF recommendation.[126]   Rather, the Fifth Circuit requires Plaintiffs to show "a

---

[123]    Plaintiffs' Response [Doc. # 128], at 30-37.

[124]    *Id.,* at 33.

[125]    *Id.*, at 31.

[126]    Plaintiffs' Sur-reply [Doc. # 134], at 8.   The Court notes that the PERF
recommendation simply stated "CED activations should be tracked in the
department's early intervention system (EIS)."  PERF Recommendation [Doc. # 128-
14], at 27.  The recommendation does not state *how* CED activations should be
tracked in an early intervention system, which is particularly significant for a police
department, like HPD, that employs multiple early warning systems.  *See McClelland*
Dep., at 166:21-23.   HPD has reviewed CED activations as tracked through an
independent system.  *See* Deposition of Reid Cashdollar [Exh. DD to Doc. # 86]
("Cashdollar Dep."), at 97:4-16; Summary of Significant Event Report Involving
CEDs [Exh. # 129-11].  Thus, HPD's review of CED activations appears to have
conformed with one construction of the PERF recommendation.

pattern of violations" that establishes that the failure to adopt this recommendation—and thus properly supervise—would "obviously likely [result] in a constitutional violation." *Goodman*, 571 F.3d at 395; *see also id.* at 396 ("Goodman . . . points to no pattern of violations or deficiencies in the training program."). Plaintiffs have not presented any evidence of other officers' conduct that would have put HPD on notice that the suggested change to its PCP system was known to be necessary and that the City chose deliberately not to follow the suggestion. Without this evidence, Plaintiffs have not produced evidence sufficient to prove that the City exhibited "deliberate indifference" in failing to adopt the PERF recommendation. *See Valle v. City of Houston*, 613 F.3d 536, 548 (5th Cir. 2010) ("However, the Valles did not link this *potential* for constitutional violations to a pattern of actual violations sufficient to show deliberate indifference. . . . We further note that it is difficult to show deliberate indifference in a case such as this one where the city has implemented at least some training." (emphasis in original)); *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) ("[T]he plaintiff must demonstrate at least a pattern of *similar incidents in which citizens were injured*. Moreover, a showing of deliberate indifference requires that the Plaintiffs show that the failure to train reflects a deliberate or conscious choice to endanger constitutional rights. . . . Prior indications cannot simply be for any and all 'bad' or unwise act, but rather must point to the specific violation in question." (emphasis in original) (internal quotations and citations omitted)); *see also Winston v. City of Shreveport*, 390 F. App'x 379, 385 (5th Cir. 2010) ("Winston, however, has failed to offer any additional evidence that would tie Corporal Sawyer's activity with any alleged failure by Chief Vansant personally to train, supervise, or discipline his officers. . . . Winston's failure to offer any proof of a pattern of violations demonstrates that any alleged wrongdoing on the part of Chief Vansant could be

characterized as merely negligence, rather than the required deliberate indifference.").[127]   Accordingly, the City is entitled to summary judgment on Plaintiffs' failure to supervise claim.

### 3.    Single Incident Liability

Plaintiffs also assert a "single-incident" theory against the City.  Plaintiffs assert two versions of this theory: (a) that the City did not properly train Gardiner in CED use and deployment; and (b) that, in light of Gardiner's IAD complaint history, the City failed to provide proper training to Gardiner about the use of force.[128]   The Court concludes that Plaintiffs have not met their summary judgment burden and that the City is entitled to dismissal of both versions of the theory.

In *Brown v. Bryan County*,[129] the Fifth Circuit held that, just like the failure to provide adequate training to police officers generally can amount to a "policy" leading to municipal liability, the failure to train a single officer can also amount to a municipal policy.  219 F.3d 450, 458 (5th Cir. 2000).  In *Brown*, a jury determined that an arresting officer used excessive force against Brown, causing her injury.  *Id.* at 453.  The jury also found that the County policymaker "failed to train [the officer]

---

[127]    Moreover, as the *Valle* Court recognized, the mere fact that other shootings occurred does not itself, without more, "establish a pattern of constitutional violations," because "[a]lthough it is possible to infer that these prior shootings may have involved the use of excessive force, that inference is too tenuous to survive summary judgment."  *Valle*, 613 F.3d at 548.

[128]    Plaintiffs' Response [Doc. # 128], at 37-42.

[129]    The Fifth Circuit's decision in *Brown* came after the Supreme Court vacated and remanded the Circuit's prior decision in *Board of County Commissions of Bryan County, OK v. Brown*, cited *supra*, Part III.C.2.

in the proper use of force." *Id.*[130]  The Court of Appeals ruled that the policymaker had "sufficient notice . . . of the need to train [the officer] so as to make failure to require training a conscious decision." *Id.* at 458.  The Court of Appeals also read *City of Canton* to support the proposition that "a single incident of an alleged constitutional violation resulting from the policy may serve as a basis for liability so long as that violation was an obvious consequence of the policy." *Id.* at 460.  Finally, the Court also concluded that "the County's provision of *no* training (and *no* supervision) to [the officer in question], on these facts, constitutes deliberate indifference to the health and safety of the citizens of Bryan County." *Id.* at 462 (emphasis in original).

Subsequent Fifth Circuit decisions have recognized the "single incident exception" is "a narrow one, and one that we have been reluctant to expand." *Burge v. St. Tammany Parish*, 336 F.3d 363, 372 (5th Cir. 2003).  As the Fifth Circuit has explained, "[t]o rely on this exception, a plaintiff must prove that the highly predictable consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation." *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2007) (internal citations omitted).   In *Roberts*, for example, the Fifth Circuit emphasized that, in *Brown*, there was a complete lack of training for the officer.  The Court there noted that the "failure to train in one limited area" was one reason to distinguish *Brown*.  *See Escbobar v. City of Houston*, 2007 WL 2900581, at *7 (S.D. Tex. Sept. 29, 2007) (Rosenthal, J.) (citing *Roberts*, 397 F.3d at 295-96).

---

[130]     Indeed, "the evidence, viewed in the light most favorable to the jury's verdict, showed the County to have a policy of providing no training itself for its regular officers and reserve deputies" and the record was not clear whether reserve deputies were required to participate in any other training provided by third-parties. *Brown*, 219 F.3d at 455.

The Supreme Court recently rejected a claim of municipal liability for failure to train based on a single constitutional violation, an assistant district attorney's violation of the *Brady* doctrine.[131]  *See Connick v. Thompson*, 131 S.Ct. 1350 (2011). While recognizing that *City of Canton* left open the possibility of single-incident liability, *id.* at 1361, the Court held that theory was misplaced in the context of *Brady* violations because, in "light of this regime of legal training and professional responsibility, recurring constitutional violations are not the obvious consequence of failing to provide prosecutors with formal in-house training about how to obey the law." *Id.* at 1363.[132]

The alleged failure of the City to properly train Gardiner with regard to CED deployment is insufficient as a basis for single-incident municipal liability.[133]  As noted above,[134] the City provides extensive training to its cadets and officers, and that training complies with State (TCLEOSE) standards.  To the extent that officers are not trained with regard to CED deployments, this amounts to a failure to train "in one limited area" and not a complete failure to train.  Further, Plaintiffs have not shown that the "highly predictable consequence" of a failure to train officers in proper CED

---

[131]     *See Brady v. Maryland*, 373 U.S. 83 (1963).

[132]     Moreover, the Court stressed that the "*Canton* hypothetical" was based on "the armed police officers [having] *no* knowledge at all of the constitutional limits on the use of deadly force."  The Supreme Court noted this standard was not applicable with regard to *Brady* violations (where it was clear that prosecutors had some knowledge of *Brady*).  *Id.* (emphasis added).

[133]     Neither Plaintiffs nor Defendants have discussed the training that HPD officers receive (or lack thereof) with regard to CED deployments.  The Court assumes for purposes of the pending motions, but does not decide, that the City's training in this area was deficient.

[134]     *See supra* Part III.A.2.a.

use would be the shooting, and subsequent death, of an individual by use of a firearm.[135]

Similarly, Plaintiffs' claim that the City is liable for not properly retraining Gardiner in light of his complaint history fails.  While Gardiner had several prior complaints regarding the discharge of firearms and the use of force,[136] none were

---

[135]    Plaintiffs rely on their expert Clark's opinion to establish a connection between Gardiner's CED use and this incident.  *See* Plaintiffs' Response [Doc. # 128], at 42.  In particular, Plaintiffs cite Clark's statements that:

> Officer Gardiner also ranked within the top 10 most frequent uses of the Taser in the entire HPD.  Had the [PCP] system been implemented properly, Officer Gardiner would have been identified as a problem officer long before his shooting of Mr. Barns [*sic*].  Officer Gardiner should have been removed from duty and subject to termination, discipline or intervention before this incident and that would have prevented his shooting of Mr. Barnes. . . . In sum, it is my opinion that the PCP is an ineffective policy that fails to identify problem officers such as Officer Gardiner and HPD's PCP policy reflects a deliberate indifference to the rights of the citizens of Houston.

Expert Report of Roger Clark [Doc. # 128-20], at 4-5.  In the exercise of gatekeeping functions under *Daubert*, 509 U.S. 579 (1993) (*passim*), the Court concludes that Clark's conclusory statements, entirely without reasoning, without explanation of how they relate to accepted policing, psychological or training principles, and without an express nexus to accepted training materials and techniques, are insufficient to raise a genuine issue of material fact that the "highly predictable consequence" of HPD's failure to retrain Gardiner with regard to CED use would be the shooting of Barnes.  Further, Clark's opinions are vague and unreliable on their face.  Clark does not explain why an officer's being "subject to termination," "discipline," or "intervention" and some unspecified length of removal from duty before this incident "would have prevented his shooting of Mr. Barnes."  Finally, with reference to the quoted opinions, the reference to "deliberate indifference" is unreliable and thus inadmissible because Clark admittedly uses the term without knowledge of its legal meaning. Deposition of Roger Clark [Doc. # 122-1] ("Clark Dep."), at 71:11-14.

[136]    *See* Employee Complaint History [Exh. B to Doc. # 86]; Plaintiffs' Response [Doc.
(continued...)

sustained.   Indeed, each was determined by HPD to either be "justified," "not sustained," "unfounded," or "never formalized."[137]   Furthermore, none of those complaints involved the type of conduct at issue in this case, namely a lethal shooting.  The record is undisputed that HPD officers are trained in the use of force and provided instruction regarding when deadly force is appropriate.[138]  Additionally, Plaintiffs have not submitted any evidence tending to create a genuine issue of material fact as to how Gardiner's lack of cadet training or in service training while an officer made this incident "highly predictable."[139]

---

[136]   (...continued)
# 128], at 40.

[137]   *See* Investigative Summaries [Docs. # 128-12 to # 128-20].

[138]   *See* Expert Report of Michael Dirden [Exh. M to Doc. # 86], at 5-6.

[139]   Here too, Plaintiffs link this incident to Gardiner's lack of training solely through a conclusory statement by their expert, Roger Clark.  Clark states that:

> Despite Officer Gardiner's obvious deliberate past and present departure from the required tactics, the HPD chain of command has negligently retained him on active duty and even without any discipline or retraining whatsoever.  Officer Gardiner's past history demonstrates that he was not adequately trained prior to this incident to handle situations of this type, and the HPD appears to continue to hold to the opinion that he acted within their established policy as it has been conveyed to him prior to the incident.  The HPD failures in this regard reflect an unacceptable negligence in their command, supervision, training, investigation, and retention of Officer Gardiner as an HPD officer.

Expert Report of Roger Clark [Doc. # 128-20], at 4.  Clark provides no explanation of the connection between his conclusory opinions and recognized police procedures and training materials. He cites to nothing specific in the HPD or other police departments' training materials.  Nor does Clark tie the facts of Gardiner's prior shooting or CED deployment incidents to his conclusions about the Barnes' incident.
(continued...)

### 4.      Ratification

Finally, Plaintiffs seek to hold the City liable under § 1983 for "affirming, ratifying, and adopting the unlawful conduct of Officer Gardiner."[140]  *See City of St. Louis v. Prapotnik*, 485 U.S. 112, 127 (1988) (recognizing a "ratification" theory for municipal liability).  Both Plaintiffs and the City have moved for summary judgment on this claim.  Plaintiffs' theory is essentially a request for a conditional ruling that "if Plaintiffs prove that Officer Gardiner's actions were unconstitutional and that his actions were manifestly indefensible, that Chief McClelland ratified these actions as being within HPD policy and therefore the City of Houston is liable under § 1983."[141]  The City, in contrast, asks for summary judgment on the grounds that the circumstances here do not amount to an "extreme factual situation" as required under controlling case law.[142]

In *City of St. Louis v. Prapotnik*, the Supreme Court articulated that "[i]f the

---

[139]    (...continued)
In sum, Clark's bald conclusions on which Plaintiffs rely are mere *ipse dixit* and inadmissible. *See, e.g., Kumho Tire*, 526 U.S. at 157; *Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

[140]    Complaint, ¶ 67(I).  As the Honorable Keith Ellison has pointed out, the case law remains unclear as to whether "ratification" is an independent theory of municipal liability or simply a theory by which a plaintiff can show a municipal policy or custom. *See Hobart v. City of Stafford*, 916 F. Supp. 2d 783, 793-94 (S.D. Tex. 2013) (Ellison, J.).  For purposes of this motion, the Court assumes that *Praprotnik* established a new, and independent, theory of liability for "ratification."

[141]    Plaintiffs' Motion for Summary Judgment on Ratification [Doc. # 89], at 5.

[142]    City Defendants' Motion for Summary Judgment [Doc. # 86], at 35-36 (citing *Peterson v. City of Fort Worth, Texas*, 588 F.3d 838 (5th Cir. 2009), and *Oporto v. City of El Paso*, 2012 WL 2191697 (W.D. Tex. June 14, 2012)).

authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." 485 U.S. 112, 127 (1988). Though the Supreme Court has not returned to this theory of liability since the *Praprotnik* decision, the Fifth Circuit, on multiple occasions, has "either recognized or indicated that it would give favorable treatment to" this theory. *Santibanes v. City of Tomball, Tex.*, 654 F. Supp. 2d 593, 610-11 (S.D. Tex. 2009) (Hoyt, J.) (collecting cases).[143]

Under controlling Fifth Circuit precedent, the theory of ratification can only be applied to "extreme factual situations." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 848 (5th Cir. 2009). In *Peterson*, the plaintiff sued the City of Fort Worth under § 1983 based on allegations that officers had unlawfully detained him and used excessive force to restrain him. *Id.* at 844. Among the theories the plaintiff sought to use in asserting municipal liability was the theory of ratification, contending that the Chief of Police determined, after investigation, that the officers' questioned conduct "complied with the department's policies." *Id.* at 848. The Fifth Circuit disagreed, holding that the case did not present "an extreme factual situation" and that "a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality." *Id.*

Importantly, as the *Praprotnik* Court stated, a municipality can only be liable under this theory if the policymaker approves "the basis for" the subordinate's

---

[143]     An authorized policymaker is one who has the ability to make "*final* policy." *Praprotnik*, 485 U.S. at 127 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-84 (1986)) (emphasis in original). Neither party addresses whether Chief McClelland can be considered an "authorized policymaker" under *Praprotnik*. The Court assumes for present purposes that Chief of Police McClelland had the ability to establish final policy regarding police matters for the City. *See Santibanes*, 654 F. Supp. 2d at 610-11 ("Hence, it is clear that Chief Blake, as Chief of Police, was a city policymaker during all relevant times alleged in this suit.").

decision. *Praprotnik*, 485 U.S. at 127; *see also Hobart v. City of Stafford*, 916 F. Supp. 2d 783, 795 (S.D. Tex. 2013) (Ellison, J.); *Oporto v. City of El Paso, Tex.*, 2012 WL 2191697, at *9 (W.D. Tex. June 14, 2012) (stating that plaintiff must show approval of "the unconstitutional basis for" the subordinate's decision).   "A municipality is not liable under the ratification theory where a Police Chief accepts his officers' version of events, so long as that version did not show that the deputies' actions were manifestly indefensible." *Hobart*, 916 F. Supp. 2d at 795 (quoting *Allen v. City of Galveston, Tex.*, 2008 WL 905905, at *8 (S.D. Tex. Mar. 31, 2008)); *see also Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010) ("Good faith statements made in defending complaints against municipal employees do not demonstrate ratification.").

The Court concludes that, as a matter of law, the City cannot be liable under a theory of ratification when the evidence is construed in Plaintiffs' favor.  The facts underlying the shooting are contested in important respects, but there is no dispute that Gardiner told HPD's IAD that he believed Barnes was aiming a TASER at him when he shot Barnes.  While Echols and four other witnesses stated that they did not see a TASER in Barnes' hands, HPD's IAD investigated and determined, based on its assessment of the contested evidence and its conclusion that Gardiner acted in self-defense, that Gardiner's shooting was justified.[144]   In adopting IAD's recommendation, Chief McClelland relied on IAD's investigation and its conclusion that the shooting was provoked.[145]  Chief McClelland did not ratify Plaintiffs' version

---

[144]   *See* Investigation Summary [Exh. E to Doc. # 86], at 5-6 ("The investigation revealed sufficient evidence to prove the firearm discharges by Officer Gardiner that resulted in the death of Mr. Barnes were justified under State law and department policy.").

[145]   Objections and Answers of Charles A. McClelland Jr. to Plaintiffs' Interrogatories
(continued...)

of the facts, *i.e.*, "the unconstitutional basis" for Gardiner's conduct. *See Oporto*, 2012 WL 2191697, at *9-10 ("Chief Allen did not ratify an 'unconstitutional basis' for the shooting, but rather approved of a constitutional basis for the shooting. If Chief Allen had relied on Plaintiffs' version of the facts—namely, that Martinez was unarmed and not dangerous—and then approved of the Officers' shooting, the ratification theory could be successful. But that is not what Chief Allen did.").

Moreover, this case does not present an "extreme factual situation" as required under *Peterson*. In *Snyder v. Trepagnier*, for example, the Fifth Circuit rejected a claim of ratification where a police officer had shot a fleeing suspect in the back. *Snyder v. Trepagnier*, 142 F.3d 791, 797-98 (5th Cir. 1998). Similarly, in *Peterson*, the Fifth Circuit rejected ratification where a police officer had detained and stricken a suspect, injuring the suspect to the point of needing surgery. *Peterson*, 588 F.3d at 848. Indeed, the only case where the Fifth Circuit seems to have upheld ratification in the context of excessive force is *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161 (5th Cir. 1985). *See Hobart*, 916 F. Supp. 2d at 796 ("[The Court] follows suit and compares the facts of the case before it to *Grandstaff*. It does so because of the lack of any other successful ratification claims premised on the use of excessive force."). But in *Grandstaff*, the Fifth Circuit upheld the theory of ratification where, in searching for a suspect, multiple officers surrounded an innocent person's vehicle and "poured their gunfire at the truck" and "showed no inclination to avoid inflicting unnecessary harm upon innocent people," despite knowledge that an innocent person could be in the car. *Grandstaff*, 767 F.2d at 167-68. The Court of Appeals held that the "disposition of the policymaker may be inferred from his conduct after the events

---

[145]    (...continued)
[Doc. # 129-7], at 15-16. The IAD's conclusions were based on conflicting evidence presented.

of that night" and that the "reaction to so gross an abuse of the use of deadly weapons says more about the existing disposition of the City's policymaker than would a dozen incidents where individual officers employed excessive force." *Id.* at 171. The case at bar does not present a situation so "extreme." Rather, Chief McClelland was informed that Gardiner shot Barnes after Barnes resisted arrest and scuffled with Gardiner, and after Gardiner, according to his statement, perceived Barnes aiming a TASER at him. Whether or not Gardiner's conduct in hindsight was justified and thus constitutional, Chief McClelland was not ratifying an officer's actions that rose to the level of an "extreme factual situation," as ratification theory requires under Fifth Circuit case law.

For the foregoing reasons, the City is entitled to summary judgment on all bases of municipal liability asserted by Plaintiffs.[146]

## C.    **Gardiner's Individual Liability**

Plaintiffs bring two claims under 42 U.S.C. § 1983 against Gardiner in his individual capacity. Plaintiffs claim (1) Gardiner used excessive force against Barnes in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution;[147] and (2) Gardiner failed to provide medical attention to Barnes after he shot him.[148] Gardiner asserts that he is entitled to qualified immunity on both theories.[149] The Court denies Gardiner's Motion for Summary Judgment with respect to the excessive

---

[146]    Because the Court grants summary judgment to the City, City Defendants' Motion to Bifurcate Trial [Doc. # 88] is moot.

[147]    Complaint, ¶¶ 54-59.

[148]    *Id.*, ¶¶ 60-62. Plaintiffs do not allege a constitutional basis for this claim, as required for claims brought under § 1983.

[149]    City Defendants' Motion for Summary Judgment [Doc. # 86], at 37-42.

force claim and grants the motion with respect to the failure to provide medical attention claim.[150]

### 1.    Qualified Immunity

Officials sued in their individual capacities are protected by qualified immunity unless the officials' conduct violates a constitutional right clearly established at the time he acted.  *Sanchez v. Swyden*, 139 F.3d 464, 466-67 (5th Cir. 1998).  "The doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions." *Cozzo v. Tangipahoa Parish Council-President Gov't*, 279 F.3d 273, 284 (5th Cir. 2002) (quoting *Thompson v. Upshur Cty.*, 245 F.3d 447, 456 (5th Cir. 2001)).  "The Supreme Court has characterized the doctrine as protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

In assessing qualified immunity, the Court must conduct a bifurcated analysis.  *See, e.g., Collins v. Ainsworth,* 382 F.3d 529, 537 (5th Cir. 2004).  First, the Court must decide whether the plaintiff has shown a violation of a clearly established constitutional right.  *See id.*  A right is "clearly established" if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987); *see also Collins*, 382 F.3d at 537.  Second, a court must address whether the defendant's "actions were objectively reasonable" in light of "law which was clearly established

---

[150]    To the extent that Plaintiffs seek sanctions against City Defendants under Rule 11 of the Federal Rules of Civil Procedure for pleading a qualified immunity defense, *see* Plaintiffs' Response [Doc. # 128], at 19, that request is denied.

at the time of the disputed action."[151] *Collins,* 382 F.3d at 537. "The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated" the plaintiff's asserted constitutional or federal statutory right. *Thompson,* 245 F.3d at 457 (citations omitted) (emphasis in original). "Thus, an individual defendant's subjective state of mind is irrelevant to the qualified immunity inquiry" in the context of a Fourth Amendment claim. *See Cozzo,* 279 F.3d at 284.

At the summary judgment stage of a § 1983 action, a defendant asserting qualified immunity is not required to establish the defense beyond peradventure, as he would have to do for other affirmative defenses. Indeed, "[t]he moving party is not required to put forth evidence to meet its summary judgment burden for a claim of immunity. It is sufficient that the movant in good faith pleads that it is entitled to absolute or qualified immunity. Once the [movant] *asserts* this affirmative defense, the burden *shifts* to the plaintiff to rebut it." *Cousin v. Small*, 325 F. 3d 627, 632 (5th Cir. 2003) (citations omitted) (emphasis in original). Plaintiffs thus bear the burden of negating City Defendants' claim of qualified immunity. *See Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489-90 (5th Cir. 2001).

The issue of qualified immunity is generally a question of law for the court. *See Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citing *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999)). "However, underlying historical facts may be in dispute that are material to the reasonableness determination," making summary judgment inappropriate. *Williams*, 180 F.3d at 703 (citing *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994)); *see also Wooley v. City of Baton Rouge*, 211 F.3d

---

[151]   These two prongs are distinct and either can be addressed first. *See Tolan v. Cotton*, 713 F.3d 299, 305 (5th Cir. 2013) ("[T]hose prongs remain distinct and require independent inquiry.  Importantly, the sequence of analysis is immaterial.").

913, 919 (5th Cir. 2000) ("This issue, too, generally is a question of law, but denial of summary judgment based on a material factual dispute would be appropriate if there are underlying historical facts in dispute that are material to resolution of the question whether the defendants acted in an objectively reasonable manner.").

### 2.    Excessive Force Claim Against Gardiner

The Court concludes there is a genuine issue of material fact as to whether Gardiner used excessive force against Barnes.

### a.    "Clearly Established Constitutional Right"

Plaintiffs assert that Gardiner used excessive force against Barnes in violation of Barnes' rights under the Fourth Amendment.[152]  "To prevail on an excessive force claim, a plaintiff must establish: (1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."  *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007).  The Supreme Court has stated explicitly that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *see also Tolan v. Cotton*, 713 F.3d 299, 307 (5th Cir. 2013) ("To be sure, it was clearly established that shooting an unarmed, non-threatening suspect is a Fourth-Amendment violation.").

Under Plaintiffs' version of the facts, which the Court accepts for purposes of summary judgment, Barnes had left Echols and Gardiner, walked to his car, and was leaning against that car when Gardiner shot him.  Barnes was unarmed at the time and posed no threat to Gardiner.  Under this version of the facts, it was clearly established at the time of the incident that Gardiner's shooting violated the Fourth Amendment.

---

[152]    Complaint, ¶ 56.

### b.    "Objectively Reasonable"

Gardiner asserts that even if he used excessive force, he is entitled to qualified immunity because his actions were "objectively reasonable" in light of the circumstances.[153]    In particular, Gardiner emphasizes that "it is the officer's perception that is key," and that "[e]ven if the officer perceives a weapon when no weapon is found, the decision to use deadly force may be entirely constitutional."[154] Furthermore, Gardiner states that "[t]his case may present a close call, but it is in precisely this situation that qualified immunity should protect the officer from being judged by 20/20 hindsight."[155]    In short, Gardiner contends that "the undisputed material fact[s] establish[] that [he] reasonably perceived the threat of serious bodily injury from Barnes when he (Gardiner) discharged the weapon."[156]

The Court disagrees.  Accepting Plaintiffs' version of the facts, at the time he was shot Barnes was unarmed, had extricated himself from his previous encounter with Gardiner, and was not acting in a physically threatening manner.  Instead, he merely was leaning against a car.  Echols and four other witnesses all testified that Barnes was not pointing Gardiner's TASER at Gardiner.  Even if Barnes had shouted to Gardiner, "What are you going to do? Shoot me?,"[157] Barnes did not pose a physical threat to Gardiner.  No reasonable officer under such circumstances would have thought it constitutionally acceptable to shoot Barnes.  In other words, Plaintiffs have established a genuine question of material fact that a reasonable officer under

---

[153]    *See* City Defendants' Motion for Summary Judgment [Doc. # 86], at 38-41.

[154]    *Id.*, at 40.

[155]    *Id.*, at 39.

[156]    City Defendants' Reply [Doc. # 133], at 6.

[157]    Echols Dep., at 59:1-3.

these conditions would have known that Gardiner's conduct violated the Fourth Amendment. *See Baker v. Putnal*, 75 F.3d 190, 198 (5th Cir. 1996) (reversing grant of summary judgment on qualified immunity grounds where witnesses testified that decedent "took no threatening action" toward officer and officer testified that decedent aimed weapon at him, stating that "[t]here are simply too many factual issues to permit the Bakers' § 1983 claims to be disposed of on summary judgment").[158]

Gardiner relies heavily on the Fifth Circuit's recent decision in *Tolan v. Cotton*, 713 F.3d 299 (5th Cir. 2013), to support his claim of qualified immunity.  That case arose from an officer's surveillance of a suspect (Tolan) and another after incorrectly believing that the car Tolan was deriving was a stolen vehicle.  *Id.* at 301-02.  The officer was faced with a chaotic scene after the suspect's mother intervened and refused to comply with orders.  *Id.* at 302-03.  When the officer's handling of the mother angered Tolan, Tolan pushed up from his prone position on the ground and turned towards the officer; the officer, out of fear, shot him.  *Id.* at 303.  Tolan sued under 42 U.S.C. § 1983 on a claim of excessive force, and the officer moved for summary judgment on qualified immunity.  The Fifth Circuit affirmed the district

---

[158]  For the purposes of this motion for summary judgment, the Court does not rely on Gardiner's contention—disputed by significant other evidence—that he had a "reasonable perception" that Barnes had disarmed him of his TASER as the undisputed facts.  *See* City Defendants' Reply [Doc. # 133], at 6.  Plaintiffs have presented evidence supporting their position that Barnes never held Gardiner's TASER and that, at the time of the shooting, Barnes was not aiming the TASER at Gardiner.  *See, e.g.,* Irby Dep., at 16:25-17:3; Gagnard Dep., at 12:2-4; Hicks Dep., at 15:8-15; Investigation Summary [Doc. # 129-4], at 4 (statement of Joe Hull that "I could see both of his (Mr. Barnes') hand clearly . . . he had nothing at all in them."); Crime Laboratory Supplement to HPD Offense Report [Exh. J to Doc. # 86].  Gardiner, in effect, seeks construction of disputed facts in his favor, a step prohibited on summary judgment in the face of Plaintiffs' evidence.

court's grant of summary judgment, focusing particularly on whether the officer's conduct was objectively reasonable given the circumstances. *Id.* at 304-05. The Court stressed the "undisputed summary-judgment" evidence that: "Officer Edwards and Sergeant Cotton believed they were dealing with a felony vehicle theft; multiple burglaries of vehicles had occurred in the area the night prior; the Tolans' front porch was not well lit; Robbie Tolan, in spite of Officer Edwards' having drawn his pistol, disobeyed orders to remain prone while the Officers attempted to establish order and investigate the situation; and Robbie Tolan's moving to intervene in Sergeant Cotton's separating his mother was preceded by his shouting 'get your fucking hands off my mom!.' *Id.* at 305-06. Furthermore, the Court pointed to other factors, such as "the late hour," "Marian Tolan's refusing to remain quiet and calm," and "the Officers' being outnumbered on the scene," in determining that an objectively reasonable officer could believe that his safety was threatened. *Id.* at 307.

The facts presented by Plaintiffs in the case at bar are simply not comparable to those in *Tolan*, and thus *Tolan* is not dispositive. Here, relying in the facts Plaintiffs present, Gardiner observed a verbal argument between Echols and Barnes.[159] Gardiner attempted to end that argument and ordered Barnes to the ground. Barnes did not comply with the order, and attempted to walk away. Gardiner initiated a physical encounter with Barnes, after which Barnes again separated himself and walked away. Gardiner, however, escalated the situation once more and shot a passive and unarmed Barnes. Unlike in *Tolan*, there were no factors indicating that Barnes posed a threat to Gardiner's safety. Plaintiffs have presented facts sufficient to raise a genuine issue of material fact that Gardiner acted unreasonably by using

---

[159]   To the extent that there was also a physical altercation between Echols and Barnes in the apartment, there is no indication that Gardiner was aware of that altercation.

unconstitutional force against Barnes.[160]

### 3.    Failure to Provide Medical Attention

Gardiner has also moved for summary judgment on Plaintiffs' claim that Gardiner failed to "provide medical care and attention" to Barnes after the shooting.[161]  Gardiner asserts that "the undisputed evidence indicates that Barnes died almost immediately as a result of the shooting."[162]  Furthermore, Gardiner points to Echols' testimony that "the first thing" Gardiner did after he shot Barnes was use his radio to call for medical help.[163]

To prove liability in the context of failure to provide medical care, a plaintiff must show "deliberate indifference," which means that "1) the official was aware of facts from which an inference of substantial risk of serious harm could be drawn; 2) the official actually drew that inference; and 3) the official's response indicates the official subjectively intended that harm occur."  *Thompson v. Upshur County, TX*, 245 F.3d 447, 458-59 (5th Cir. 2001).  Negligence or gross negligence cannot serve

---

[160]    The Court in *Tolan* also focused on Tolan's "refusal to obey a direct order to remain prone," which "violated Texas Penal Code § 38.15 and Texas Transportation Code § 542.001."  *Tolan*, 713 F.3d at 308.  According to the *Tolan* Court, "[s]uch refusal, under the circumstances, could have reinforced an officer's reasonably believing Robbie Tolan to be a non-compliant and potentially threatening suspect."  *Id.*  The evidence of record here leaves little doubt that Barnes also disobeyed Gardiner's order, which was to "go to the ground."  Unlike Tolan, however, Barnes did not "abruptly attempt[] to approach" Gardiner in a way that could have led Gardiner to fear for his safety.  Rather, as noted, Barnes had walked away and there was no indication that he had committed a serious crime or any meaningful violation of the law.  Thus, Barnes' disobedience does not entitle Gardiner to summary judgment on qualified immunity.

[161]    Complaint, ¶ 60.

[162]    City Defendants' Motion for Summary Judgment [Doc. # 86], at 41.

[163]    *Id.*, at 42.

as a basis for a deliberate indifference determination. *Id.* at 459.

Gardiner is entitled to summary judgment on this claim. The evidence of record is undisputed that Gardiner checked Barnes' pulse immediately after shooting him and then used his radio to call for an ambulance.[164]   Gardiner determined that Barnes was completely still and his skin was cold, and that there was nothing he could do "without harming him worse."[165]   Plaintiffs have not presented any contradictory evidence that Gardiner could have done anything to save Barnes. Further, Plaintiffs have presented nothing to establish that Gardiner "subjectively intended that harm occur" as the result of not providing sufficient medical care. Accordingly, Plaintiffs' claim against Gardiner for failure to provide medical care is dismissed.

### D.    Liability of Woodland Hills

Plaintiffs allege that Woodland Hills is liable for Gardiner's conduct on two theories: (1) vicarious liability; and (2) direct liability (*i.e.*, negligent hiring, training, and supervision). The Court grants Woodland Hills' Motion for Summary Judgment on each of these claims.

### 1.    Vicarious Liability

Plaintiffs contend that Woodland Hills is vicariously liable for Gardiner's actions under the doctrine of *respondeat superior*.[166]   Under the doctrine of *respondeat superior*, an employer may be held liable for the torts of an employee committed in the "course and scope of his employment." *Goodyear Tire and Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007). To be within the course and scope

---

[164]    *See* Echols Dep., at 78:1-4, 79:8-15; Gardiner Dep., at 207:3-7.

[165]    Gardiner Dep., at 273:23-25, 275:6-7.

[166]    Complaint, ¶ 79.

of employment, an employee's actions must be taken "in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired" and "of the same general nature as the conduct authorized or incidental to the conduct authorized to be within the scope of employment." *Id.* (citing *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002)).

In contrast, employers are, in the general course, not vicariously liable for the torts of independent contractors. *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 791 (Tex. 2006) (citing *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001)). Under Texas law, the distinction between an employee and an independent contractor turns on: "(1) [t]he independent nature of his business; (2) his obligation to furnish necessary tools, supplies, and materials to perform his job; (3) his right to control the progress of the work, except as to final results; (4) the time for which he is employed; and (5) the method of payment, whether by time or by the job." *Texas A & M Univ. v. Bishop*, 156 S.W.3d 580, 584-85 (Tex. 2005) (citing *Indus. Indem. Exch. v. Southard*, 160 S.W.2d 905, 905 (Tex. 1942)). The underlying question, in essence, is "whether the employer has the right to control the progress, details, and methods of operations of the work." *Limestone Prods. Distrib., Inv. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002).[167]

Employers cannot, however, be vicariously liable for the torts committed by a police officer acting in his "public capacity." Both Texas courts and the Fifth Circuit have held that "an off-duty police officer who observes a crime immediately becomes an on-duty police officer," absolving the officer's other employer of any

---

[167]   Whether a person is an employee or an independent contractor is normally a question of fact, unless the material facts are undisputed, in which case it is a question of law. *See Olivares v. Brown & Gay Eng'g, Inc.*, 401 S.W.3d 363, 369 (Tex. App.–Houston [14 Dist.] 2013, pet. filed).

liability for the officer's actions.  *City of Dallas v. Half Price Books Records, Magazines, Inc.*, 883 S.W.2d 374, 377 (Tex. App.–Dallas 1994, no writ); *see, e.g., Williams v. Dillard's Dep't Stores, Inc.*, 211 F. App'x 327, 329 (5th Cir. 2006) ("An off-duty police officer's employer is not vicariously liable for the acts of the officer if the officer was acting in her public capacity at the time she committed the acts for which the complaint was made." (internal quotations omitted)); *Laughlin v. Olszewski*, 102 F.3d 190, 192 n.1 (5th Cir. 1996) ("Although Olszewski was employed by Ameristar at the time of the incident at issue, he identified himself to Laughlin as a City of Houston police officer and threatened to use the authority conveyed to him by virtue of his status to arrest Laughlin if he did not vacate the premises.  Moreover, under Texas law, a police officer's 'off-duty' status is not a limitation upon the discharge of police activity in the presence of criminal activity."); *Moore v. Wal-Mart Store, Inc.*, 1995 WL 449901, at *1-2 (5th Cir. 1995) (citing *Half Price Books* for proposition that off-duty officer employed by store as a security guard became an on-duty officer when responding to a crime);  *Harris County v. Gibbons*, 150 S.W.3d 877, 882 (Tex. App.–Houston [14th Dist.] 2004, no pet.) ("In fact, as a matter of law, an off-duty officer who observes a crime becomes an on-duty police officer.").[168]

---

[168]   Plaintiffs are correct that the Texas Supreme Court has never ruled on the "public capacity" exception.  *See* Plaintiffs' Response [Doc. # 119], at 28.  Nevertheless, as detailed above, numerous Texas Courts of Appeals and Fifth Circuit cases have supported the doctrine, and the parties cite no case that has rejected it.  Plaintiffs seek to rely on two Texas Supreme Court cases for the proposition that "a single employee can have more than one employer at the same time for the purposes of attributing liability."  *See Garza v. Exel Logistics, Inc.*, 161 S.W.3d 473 (Tex. 2005); *Wingfoot Enters. v. Alvarado*, 111 S.W.3d 134 (Tex. 2003).  Plaintiffs, however, acknowledge that both of these cases concern the Texas Worker's Compensation Act, not vicarious liability for claims sounding in tort.  *See* Plaintiffs' Response [Doc. # 119], at 29;
(continued...)

Even if Gardiner was Woodland Hills' employee acting within the scope of his employment as a courtesy officer in general, when he got involved in trying to stop the argument between Barnes and Echols, and subsequently shot Barnes, Gardiner acted in his "public capacity" as an HPD officer.  At the time, Gardiner responded to what he observed and believed was a crime.[169]   Gardiner was wearing his HPD uniform; he presented himself as, and appeared to Echols to be, a police officer.[170] Accordingly, Gardiner was acting in his public capacity and Woodland Hills, as a matter of law, cannot be vicariously liable for his actions.  *See Mansfield v. C.F. Bent Tree Apartment Ltd.*, 37 S.W.3d 145, 149-51 (Tex. App.–Austin 2001, no pet.) (holding that apartment complex not liable for injuries caused by security guard because security guard was acting as a on-duty officer in responding to crime and detaining injured party).

### 2.    Direct Liability

Plaintiffs also contend that Woodland Hills is directly liable for Gardiner's

---

168    (...continued)
Plaintiffs' Sur-reply [Doc. # 132], at 7.  Accordingly, those decisions are not relevant to the Court's decision here.

169    Gardiner Dep., at 323:4-10 ("Q: What was the reason that you ordered John Barnes to get on the ground?  A: Because I was going to place him under arrest.  Q: And why were you going to place him under arrest?  A: Criminal mischief, public intoxication, and a family violence investigation.").

170    Echols Dep., at 45:7-9 ("We were still talking, and I looked and I seen a police officer and I told him that.  Now there's a police officer, now you should leave, or something.").  Gardiner testified that, in responding to the argument, he was performing his duties as an HPD officer, and not as an employee of Woodland Hills. Gardiner Dep., at 313:8-14, 322:11-16.

actions.[171]   Plaintiffs argue that Woodland Hills was negligent in hiring Gardiner because Woodland Hills failed to perform a thorough (and proper) background check prior to hiring Gardiner.[172]

A claim for negligent hiring, like any other negligence claim under Texas law, requires that a Plaintiff show a "duty, a breach of that duty, and damages proximately caused by the breach." *Dangerfield v. Ormsby*, 264 S.W.3d 904, 912 (Tex. App.–Fort Worth 2008, no pet.).  More particularly, "[n]egligence in hiring requires that the employer's failure to investigate, screen, or supervise its hirees proximately caused the injuries the plaintiffs allege." *Fifth Club*, 196 S.W.3d at 796 (citing *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995)).  "An employer owes a duty to the general public to ascertain the qualifications and competence of the employees it hires, especially when the employees are engaged in occupations that require skill or experience and that could be hazardous to the safety of others." *Dangerfield*, 264 S.W.3d at 912.

Woodland Hills does not contest the fact that it owed a duty to "ascertain the qualifications and competence" of Gardiner.  Rather, Woodland Hills argues that: (1) it did not breach its duty to the general public since "[t]here is no evidence that Officer Gardiner was incompetent and that Woodland Hills knew or should have

---

[171]    Complaint, ¶¶ 75-78.

[172]    *Id.*, ¶ 76; Plaintiffs' Response [Doc. # 119], at 12-20.  Plaintiffs also argue that Woodland Hills failed to properly train and supervise Gardiner after he was hired. Complaint, ¶ 76.  Woodland Hills has moved for summary judgment with regard to this claim.  Woodland Hills' Motion for Summary Judgment [Doc. # 83], at 22-23. Plaintiffs have failed to respond to these points.  Accordingly, the Court deems this aspect of the Motion to be unopposed and grants the Motion in this regard.

known that Officer Gardiner was incompetent when he was hired"[173]; and (2) even assuming it breached its duty, "there is no evidence that Woodland Hills' alleged negligence proximately caused Plaintiffs' alleged injuries."[174]  The Court agrees that Plaintiffs have not offered sufficient evidence to create a genuine issue of material fact as to either component of the negligence test.

### a.    Breach of Duty

Plaintiffs argue that Woodland Hills breached its duty by failing to properly inspect Gardiner's qualifications and performed a "woefully inadequate background check."[175]   Plaintiffs contend that had Woodland Hills requested Gardiner's HPD records, conducted interviews with the HPD regarding Gardiner, or searched publicly available resources for stories about Gardiner, Woodland Hills would have discovered Gardiner's "long and consistently violent career as a police officer," including the "twenty-three separate complaints" lodged against him.[176] Discovering this information would have—under Plaintiffs' theory—presumably dissuaded Woodland Hills from hiring Gardiner as a courtesy officer.

The Court is unpersuaded.  Under Texas law, the public, such as Woodland Hills, would not have access to the complaints against Gardiner, including those that IAD concluded were "not sustained" or deemed "unfounded."  *See* TEX. LOC. GOV'T CODE § 143.089(g) ("A fire or police department may maintain a personnel file on a fire fighter or police officer employed by the department for the department's use, but

---

[173]    Woodland Hills' Motion for Summary Judgment [Doc. # 83], at 18.

[174]    *Id.*, at 20.

[175]    *See* Plaintiffs' Response [Doc. # 119], at 12.

[176]    *See id.* at 14-15.

the department may not release any information contained in the department file to any agency or person requesting information relating to the fire fighter or police officer.").  Plaintiffs have also not shown that Woodland Hills would have been able to interview HPD officials about Gardiner.[177]  Moreover, the only two complaints against Gardiner that were actually sustained prior to his employment with Woodland Hills both related to at-fault car accidents.[178]  Neither of these sustained complaints suggest that Gardiner, as a courtesy officer, would be a risk to residents of or visitors to Woodland Hills.  *See Khan v. Houston NFL Holdings LP*, 277 F. App'x 503, 505 (5th Cir. 2008) ("We note that an officer's fault in an automobile accident would not be evidence of a risk of using excessive force.").  Furthermore, the duties of the position that Woodland Hills sought to fill, a courtesy officer, primarily included opening and closing the pool, walking the property at night, and responding to noise complaints.  Courtesy Officer Agreement [Exh. B to Doc. # 83].  It was reasonable for Woodland Hills to assume that an active duty police officer, irrespective of prior complaints, could competently perform this work.  *See Fifth Club*, 196 S.W.3d at 797

---

[177]   Plaintiffs also contend that a "internet search" would have revealed a story in the *Houston Chronicle* regarding Gardiner's TASER use and a short, superficial press release referring to one of Gardiner's prior shootings.  Plaintiffs' Response [Doc. # 119], at 16.  Plaintiffs do not provide evidence that in 2009 it was common practice for employers to check the internet regarding prospective employees, or that there was any duty to do so.  Plaintiffs also rely on their expert, Roger Clark, who contends that "there was sufficient information on the internet regarding Officer Gardner's [*sic*] propensities to use excessive force—particularly his propensity for excessive use of his Taser weapon."  Expert Report of Roger Clark [Doc. # 128-20], at 5.  Again, Clark gives merely an *ipse dixit* statement that is insufficient to create a genuine issue of material fact as to Woodland Hills' breach of duty.  Nor does Clark provide any basis, reliable or otherwise, for employers to rely on unverified reports on the internet about individuals.

[178]   Employee Complaint History [Exh. B to Doc. # 86], at 1-2.

("While Ramirez presented evidence that Fifth Club did not perform a background check or train West, West's status as a certified peace officer made him fit for this type of work. . ."); *see also Khan*, 277 F. App'x at 504-505 (holding that defendant was not liable for negligently hiring officers who were in "good standing" with the HPD, despite evidence that officers had violated HPD regulations). Accordingly, Plaintiffs have not established a genuine issue of material fact as to whether Woodland Hills breached its duty in failing to properly evaluate Gardiner before hiring him.

> **b.    Foreseeability**

A plaintiff pursuing a negligence claim must also prove that the "failure to investigate, screen, or supervise its hirees proximately caused the injuries the plaintiffs allege." *See Fifth Club*, 196 S.W.3d at 796 (internal quotation omitted). The two elements of proximate cause are cause in fact and foreseeability. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). Cause in fact requires that the defendant's conduct or product be "a substantial factor" in bringing about the injury which would not otherwise have occurred. *JCW Elecs., Inc. v. Garza*, 176 S.W.3d 618, 631 (Tex. App.—Corpus Christi 2005, reh'g overruled), *rev'd on other grounds*, 257 S.W.2d 701 (Tex. 2008) (implied warranty of fitness for a particular purpose); *Prudential Ins. Co. v. Jefferson Assocs.*, 896 S.W.2d 156, 161 (Tex. 1995) (DTPA action discussing negligence as requiring "proof that an act or omission was *a* substantial factor in bringing about injury which would not otherwise have occurred" (emphasis added)); *see also McClure v. Allied Stores of Texas, Inc.*, 608 S.W.2d 901, 903 (Tex. 1980) (negligence action requiring that "the act or omission was *a* substantial factor in bringing about the injury and without which no harm would have occurred" (emphasis added)). Foreseeability is satisfied by showing that the actor,

as a person of ordinary intelligence, should have anticipated the danger to others by his negligent act or omission. *Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d at 478; *McClure v. Allied Stores of Texas, Inc.*, 608 S.W.2d 901, 903 (Tex. 1980) (citing *Clark v. Waggoner*, 452 S.W.2d 437, 440 (Tex. 1970)).

Plaintiffs have not met their burden on the foreseeability prong. Even assuming Woodland Hills breached a duty to residents or the public by hiring Gardiner as a courtesy officer, Gardiner's subsequent shooting of Barnes four months later was not foreseeable. As noted, Gardiner's prior history revealed only two sustained complaints, both for at-fault car accidents. There is no evidence that an employer who discovered these complaints during a pre-employment background check of an officer should have foreseen that Gardiner would subsequently harm a member of the public. *See Fifth Club*, 196 S.W.3d at 796-97 (holding that violations for accepting secondary employment and for using profanity to a member of the public would not put employer on notice that hiring officer "would create a risk of harm to the public"). Moreover, assuming Gardiner's entire HPD complaint history was available to a prospective employer in connection with an "extra-job" (though there is no such evidence of record), including Gardiner's not sustained excessive force complaints and CED deployments, Woodland Hills cannot be expected to have anticipated the harm at issue here (*i.e.*, Gardiner's use of deadly force against an allegedly non-threatening person). Plaintiffs accordingly have failed to raise a genuine fact issue that Woodland Hills' conduct (*i.e.*, hiring Gardiner as a courtesy officer) proximately caused the injuries at issue here.[179]

---

[179]    Because the Court grants Woodland Hills' Motion for Summary Judgment, Woodland Hills' motion to exclude plaintiffs' expert, Roger Clark [Doc. # 92] is moot.

IV.   **CONCLUSION**

Plaintiffs have not presented sufficient evidence to create a genuine issue of material fact regarding their claims against the City and against Woodland Hills. Accordingly, the City and Woodland Hills are entitled to summary judgment on all claims against them.  For the same reason, Gardiner is entitled to summary judgment on Plaintiffs' claim of failure to provide medical care.

Plaintiffs have, however, shown the existence of genuine issues of material fact on their excessive force claim against Gardiner.  Thus, summary judgment on that claim is denied.

For the foregoing reasons, it is hereby

**ORDERED** that Defendants Hayden Properties, LLC, JS Property Management, Inc., and Woodland Hills Village Apartment Homes' Motion for Summary Judgment [Doc. # 83] is **GRANTED**.  It is further

**ORDERED** that Defendants City of Houston and Ryan Gardiner's Motion to Dismiss Karen Echols for Lack of Standing [Doc. # 84] is **DENIED**.  It is further

**ORDERED** that Defendants City of Houston and Ryan Gardiner's Motion for Summary Judgment [Docs. # 86 and # 87] is **GRANTED IN PART** and **DENIED IN PART**.  It is further

**ORDERED** that Defendants City of Houston and Ryan Gardiner's Motion to Bifurcate Trial [Doc. # 88] is **DENIED AS MOOT**.  It is further

**ORDERED** that Plaintiffs Karen Echols, individually and as representative of the estate of John T. Barnes, April Gay Phillips, as next friend of CDB and JTB, and John A. Barnes' Motion for Partial Summary Judgment on Ratification [Doc. # 89] is **DENIED**.  It is further

**ORDERED** that Defendants Hayden Properties, LLC, JS Property

Management, Inc., and Woodland Hills Village Apartment Homes' Motion to Exclude Expert Witness and/or Testimony of Roger Clark [Doc. # 92] is **DENIED AS MOOT**.  It is further

      **ORDERED** that all claims against Defendants City of Houston, Hayden Properties, LLC, JS Property Management, Inc., and Woodland Hills Village Apartment Homes and Plaintiffs' failure to provide medical care claim against Defendant Ryan Gardiner are **DISMISSED WITH PREJUDICE**.  Finally, it is

      **ORDERED** that by **January 13, 2014**, the parties must **PARTICIPATE** in good faith in a mediation in order to resolve the remaining claim.

      SIGNED at Houston, Texas, this __3rd__ day of **December, 2013.**

Nancy F. Atlas
United States District Judge